# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

—————————————

Nº 09-CV-4740 (JFB)

—————————————

IN RE: VINCENT MOREO AND MARIAN NORMA MOREO,

Debtors.

VINCENT MOREO AND MARIAN NORMA MOREO,

Debtor-Appellants,

VERSUS

FRANK J. ROSSI, JR.,

Appellee.

—————————————

**MEMORANDUM AND ORDER**
September 3, 2010

—————————————

JOSEPH F. BIANCO, District Judge:

The instant case is an appeal from the voluntary bankruptcy proceeding of debtors Vincent Moreo ("Mr. Moreo") and Marian Norma Moreo ("Mrs. Moreo") (together "debtors" or "the Moreos"), pursuant to Chapter 7 of the Bankruptcy Code, in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court").

The Moreos appeal from the September 10, 2009 Memorandum of Decision and Order (hereinafter the "September 10 Memorandum and Order") of the Honorable Dorothy Eisenberg, United States Bankruptcy Judge, denying debtors' discharge under 11 U.S.C. §§ 727(a)(3) and (4). Specifically, the Bankruptcy

Court denied the debtors discharge for having submitted inaccurate and incomplete financial documents and having made a false oath or account by omitting certain assets from their original Schedules and income from their amended Means Test.

Debtors now appeal from the September 10 Memorandum and Order on the following grounds: (1) the Bankruptcy Court erred in denying Mrs. Moreo discharge under 11 U.S.C. § 727(a)(3); and (2) the Bankruptcy Court erred in denying both of the Moreos discharge under 11 U.S.C. § 727(a)(4).

As set forth below, the Court finds the debtors' arguments on appeal to be unpersuasive and affirms the Bankruptcy

Court's September 10, 2009 Memorandum and Order denying debtors' discharge.

## I. BACKGROUND

### A. The Underlying Facts

The Court incorporates the underlying facts as based on the discussion of facts in the September 10 Memorandum and Order, which are not disputed by appellants. (*See* Appellants' Mem. of Law at 1 ("Debtors do not dispute the basic facts as determined by the bankruptcy court on pages 1-8 of the Memorandum Decision.").)

In June 2003, debtors purchased the North Fork Bagel, Inc. for $125,000 from Craig Grosetto. (Tr. 214:18-19.) They renamed the store Moreo's Bagel & Café (hereinafter "the Bagel Store"). Debtors purchased the store using a $50,000 home equity loan and a $75,000 note given in favor of Mr. Grosetto. (*See* Tr. 208:19-25, 290:22-25.) Prior to purchasing the Bagel Store, debtors did not review the books and records of the North Fork Bagel, Inc. (*See* Tr. 163:9-11, 209:1-14, 214:20-215:1.) Mr. Moreo established a checking account at Washington Mutual for the Bagel Store; however, Mrs. Moreo regularly made deposits and issued checks from the checking account. (Tr. 135:16-136:6, 224:15-224:13.) Mrs. Moreo ran the day-to-day operations of the Bagel Store, met with the store's accountant, and reviewed the store's tax returns. Mr. Moreo was not involved in the administrative and financial operations of the Bagel Store. The highest level of education obtained by both debtors was a high-school education. (*See* Tr. 208:10-13.) Mr. Moreo was previously employed by Wendy's International as a service technician doing heating and air conditioning work. (Tr.

173:22-23.) He is presently employed by Lane Associates doing the same type of work.

About ten years prior to her ownership of the Bagel Store, Mrs. Moreo worked for Frank Rossi, appellee, at Price Rite Carpets. (Tr. 29:2-7, 34:16-22.) She handled floor sales at Mr. Rossi's carpet store. (*Id.*) Mrs. Moreo left her employment at Price Rite Carpets because she was diagnosed with multiple sclerosis. (Tr. 288:8-10.) She did not work for several years thereafter. Several years later, but prior to purchasing the Bagel Store, Mrs. Moreo had been employed as a part-time counter person at Bagel Buddies, a bagel store. (Tr. 288:13-16.)

Mrs. Moreo operated the Bagel Store six to seven days a week. The Bagel Store had wholesale accounts whereby it would sell bagels to restaurants and delicatessens. The wholesale customers would pay for their purchases in cash and/or by check. The Bagel Store also operated a retail business selling bagels and pastries in-store to individual customers. Mrs. Moreo stated that she did not take any salary or compensation for her work, aside from $100 a week for six months in 2005. The Bagel Store employed one full-time baker and at least one part-time employee who worked during the summers.

Mrs. Moreo paid her employees "off the books." (*See, e.g.*, Tr. 209:20-22.) She stated that she learned that practice while working at Bagel Buddies and thus adopted it for the Bagel Store. (Tr. 210:1-3.) As a result, Mrs. Moreo did not report all her payments to the employees in her taxes. The Bankruptcy Court noted that, for example, the Bagel Store reported paid salaries and wages of $10,750 for all of 2004 (Tr. 44:22-45:2), but Mrs. Moreo testified that she actually paid about $35,000 in wages to her employees. (Tr.

216:12-13.) As discussed more fully throughout this opinion, Mrs. Moreo testified that she did not keep any ledger or formal records of her receipts, expenses, or payments. Mrs. Moreo also did not make daily deposits of her cash receipts from the Bagel Store into the bank account; sometimes Mrs. Moreo would take money home with her rather than deposit it into the business account. (Tr. 201:6-203:25, 205:7-23, 237:1-18, 237:25-238:24.)

Although retail sales were generally recorded on the cash register in the Bagel Store, there was no evidence that all cash transactions relating to the wholesale customer accounts were recorded. Not all payments by or to vendors and employees were made in cash from the cash register without written record. (Tr. 219:9-22:3, 237:1-18.) Mrs. Moreo testified that, on a weekly basis, she would write down on a piece of paper what she received relating to the wholesale accounts and her expenses and would put the piece of paper and other receipts into an envelope to give to her accountant once a month or every other month. These envelopes and receipts were not produced at trial.

In January 2005, the Bagel Store had difficulty meeting its expenses; the Moreos were facing eviction by the landlord for failure to pay rent. (Tr. 14:2-8.) A mutual friend contacted appellee, who consulted with appellants regarding how to make the business profitable. (*Id.*) Appellee also agreed to provide funds to enable the Bagel Store to continue operating. The Bankruptcy Court noted that it was unclear whether he was providing funds as a partner, a lender, or as a creditor; there was no written agreement memorializing the provision of funds. (*E.g.*, Tr. 319:5-17.) Rossi used his personal funds to pay off $30,000 of the Bagel Store's rent arrears. He worked at the Bagel Store from

January through June 2005, making deliveries, collecting payments from customers, and picking up supplies for inventory. Rossi provided funds to pay all bills that the Bagel Store was unable to pay. (*E.g.*, Tr. 14:14-15.) During the first four months of 2005, Rossi invested more than $50,000 in the Bagel Store. Rossi did not receive any compensation for his work at the Bagel Store. (*See* Tr. 14-17.)

According to the Bankruptcy Court's findings, Rossi never saw any of the books and records of the Bagel Store and did not see Mrs. Moreo prepare a ledger. (*E.g.*, Tr. 24.) He attempted to show Mrs. Moreo some simple bookkeeping skills to keep track of sales and receipts. (Tr. 23:8-14.) Rossi allegedly did his own bookkeeping with respect to the Bagel Store, but the Bankruptcy Court did not receive any evidence of such bookkeeping. According to Rossi, he left in June 2005 because he suspected the Bagel Store was being run improperly and because he was in poor health. (Tr. 25:21-26:5.)

In 2006, Rossi commenced a state-court action against debtors to recover the $56,000 he had invested into the Bagel Store. Debtors needed $3,000 to make a rent payment and approached Rossi for the necessary funds. Allegedly, Rossi required Mr. Moreo to sign a statement before he would provide the additional $3,000. Mr. Moreo signed a handwritten letter dated June 9, 2006, stating that he would pay Rossi $56,000 upon the sale of the Bagel Store with the amount to be payable in cash. That letter also states that Craig Grossetto would be paid first. On June 13, 2006, debtors signed an Affidavit of Confession of Judgment in favor of Rossi for $56,000 arising from loans made by Rossi to debtors and a Judgment by Confession was

entered by the state court on August 22, 2006. (Tr. 17:24-18:22, 269:11-19.)

On November 13, 2006, appellants sold the business to Graziano & Son Enterprise for approximately $72,000. (Tr. 267:1-2.) The consideration consisted of $3,000 in cash, the assumption and satisfaction of the note given in favor of Mr. Grossetto with an outstanding balance of approximately $52,000, the satisfaction of a debt in the approximate amount of $10,000 to Empire Bakery Equipment, Inc., the satisfaction of debtors' outstanding rent obligation, which was approximately $7,500, and the satisfaction of a $200 telephone bill. (*See* Tr. 267.)

B. The Bankruptcy Proceedings

Debtors filed for Chapter 7 relief on April 13, 2007. This was Mr. Moreo's second bankruptcy filing; he had previously filed for and received a discharge in individual bankruptcy in 1998. At the time of the 2007 filing, Mr. Moreo was earning approximately $4,593 a month from his employment at Wendy's International and receiving a $1,000 a month contribution from his mother. Mrs. Moreo was unemployed and receiving $400 a month from workers' compensation and for permanent partial disability.

The Section 341 creditors meeting was held on May 15, 2007. On May 18, 2008, debtors filed Amended Schedules C, D, and F, and an Amended Summary of Schedules, and Amended Statistical Summary of Certain Liabilities and Related Data. Debtors modified their homestead exemption on Schedule C to reduce the claimed exemption from $122,551 to the statutorily permitted $100,000. Debtors also amended the schedules to correct errors regarding which creditors listed on Schedule F (relating to unsecured creditors) should have

been listed on Schedule D, because these creditors held judgment liens. Debtors scheduled $440,315 in secured debts, $62,015.71 of which is with respect to the funds given by Rossi to the Bagel Store. Debtors also scheduled $77,231.22 in unsecured debt.

On October 5, 2007, Rossi filed an adversary proceeding against debtors, seeking a denial of discharge on the grounds that (1) debtors transferred, removed, destroyed, mutilated, or concealed property within one year of the petition date with the intent to hinder, delay, or defraud a creditor under 11 U.S.C. § 727(a)(2)(A); (2) debtors falsified and failed to keep or preserve adequate records from which debtors' financial condition or business transactions might be ascertained under 11 U.S.C. § 727(a)(3); (3) debtors knowingly and fraudulently made a false oath or account in connection with their bankruptcy case under 11 U.S.C. § 727(a)(4)(A); and (4) debtors failed to satisfactorily explain any loss of assets or deficiency of assets to meet debtors' liability under 11 U.S.C. § 727(a)(5).

On January 31, 2008, debtors filed Amended Schedules B and C and an Amended Means Test Calculation. Schedule B was amended to disclose (a) Mr. Moreo's 100% shareholder interest in the Bagel Store with no value and (b) three lawsuits. These three lawsuits were a personal injury lawsuit against Frank Capella relating to a motor vehicle accident on July 23, 2003 with a value of $7,500; a personal injury lawsuit against Beach Bar, Inc. for an accident that occurred on February 23, 2005 with a value of $15,000; and a workers' compensation claim against his employer for an accident that occurred on February 23, 2005 with a value of $7,500. Debtors amended their Schedule C to include

4

a $7,500 personal injury exemption with respect to each of the three lawsuits added to Schedule B. Debtors also amended their Means Test Calculation to include a $3,500 loan from Mrs. Moreo's brother that averaged $583.33 a month over a six-month period; $308.38 in income from the operation of the Bagel Store; and a child that was mistakenly excluded from debtors' household size. The additions resulted in debtors' annualized current monthly income being more than the applicable median family income and necessitated a calculation of allowed deductions under 11 U.S.C. § 707(b)(2). One of the listed deductions in the amended Means Test is a $175 expense relating to the average monthly amount debtors paid for telecommunications services other than basic home telephone service. With these corrections, debtors passed the Means Test for the purposes of 11 U.S.C. § 707.

On July 31, 2008, Rossi filed a motion for summary judgment. On September 12, 2008, debtors filed a cross-motion for summary judgment and opposition to Rossi's motion. The Bankruptcy Court denied both motions and held a trial on June 1, 2009 on the causes of action relating to denial of discharge under 11 U.S.C. § 727(a)(3) and 11 U.S.C. § 727(a)(4). By written Memorandum and Order dated September 10, 2009, the Bankruptcy Court denied Mrs. Moreo discharge under 11 U.S.C. § 727(a)(3) and denied Mr. and Mrs. Moreo discharge under 11 U.S.C. § 727(a)(4)(A).

## C. The Instant Appeal

On November 2, 2009, debtors filed an appeal before this Court with respect to the September 10 Memorandum and Order denying debtors their discharge. On December 23, 2009, debtors filed their brief. On January

21, 2010, appellee Rossi filed his opposition. On March 8, 2010, debtors filed their reply. The Court has fully considered the submissions of the parties.

## II. STANDARD OF REVIEW

Rule 8013 of the Federal Rules of Bankruptcy Procedure provides that a reviewing court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree," or it may remand with instructions for further proceedings. *See* Fed. R. Bankr. P. 8013.

The Court will review the Bankruptcy Court's legal conclusions *de novo* and its factual findings for clear error. *See In re Hyman*, 502 F.3d 61, 65 (2d Cir. 2007); *see also Lubow Mach. Co. v. Bayshore Wire Prods. (In re Bayshore Wire Prods.)*, 209 F.3d 100, 103 (2d Cir. 2000) ("Like the District Court, we review the Bankruptcy Court's findings of fact for clear error, . . . its conclusions of law *de novo*, . . . its decision to award costs, attorney's fees, and damages for abuse of discretion."); *accord In re Ionosphere Clubs*, 922 F.2d 984, 988-89 (2d Cir. 1990). "The question of a debtor's knowledge and intent under §727(a)(4) is a matter of fact . . . ." *Cepelak v. Sears (In re Sears)*, 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000) (internal citations omitted).

## III. SECTION 727(A)(3)

The Bankruptcy Court denied Mrs. Moreo discharge under 11 U.S.C. § 727(a)(3), which provides for denial of discharge if a debtor fails to keep or preserve information regarding the debtor's financial condition and fails to produce such documentation in connection with her bankruptcy petition. For the reasons

set forth below, the Court affirms the Bankruptcy Court's conclusion.

The provisions of 11 U.S.C. § 727 must be construed "strictly against those who object to the debtor's discharge," and "liberally in favor of the bankrupt." *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996) (quoting *Bank of Pa. v. Adlman (In re Adlman)*, 541 F.2d 999, 1003 (2d Cir. 1976)). Section 727(a)(3) provides the following:

> (a) The court shall grant a debtor a discharge, unless –
>
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3). "The purpose and intent of [this section] is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." *In re Underhill*, 82 F.2d 258, 260 (2d Cir. 1936). This section also ensures that "creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history." *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992); *see also Krohn v. Frommann (In re Frommann)*, 153 B.R. 113, 116 (Bankr. E.D.N.Y. 1993).

To determine whether denial of a discharge is appropriate under § 727(a)(3), the plaintiff, who files an adversary proceeding challenging a debtor's discharge, must prove that: (1) debtor failed to keep or preserve books and records from which the debtor's financial condition or business transactions might be ascertained, and (2) this failure makes it impossible to ascertain the debtor's true financial condition. *See D.A.N. Joint Venture v. Cacioli (In re Cacioli)*, 463 F.3d 229, 235 (2d Cir. 2006). If the plaintiff challenging the discharge demonstrates the absence of accurate and complete records, "the burden falls upon the bankrupt to satisfy the court that his failure to produce them was justified." *Id.* (citing *White v. Schoenfeld*, 117 F.2d 131, 132 (2d Cir. 1941); *see also Krohn v. Cromer (In re Cromer)*, 214 B.R. 86, 98 (Bankr. E.D.N.Y. 1997). Whether a debtor's failure to keep books is justified is "a question in each instance of reasonableness in the particular circumstances." *In re Cromer*, 214 B.R. at 97 (citing *Underhill*, 82 F.2d at 259-60). To determine the reasonableness of a debtor's failure to keep books, the Court must examine eight non-exclusive factors: (1) whether the debtor was engaged in business, and if so, the complexity and volume of the business; (2) the amount of the debtor's obligations; (3) whether the debtor's failure to keep or preserve books and records was due to the debtor's fault; (4) the debtor's education, business experience, and sophistication; (5) the customary business practices for record keeping in the debtor's type of business; (6) the degree of accuracy disclosed by the debtor's existing books and records; (7) the extent of any egregious conduct on the debtor's part; and (8) the debtor's courtroom demeanor. *In re Sethi*, 250 B.R. 831, 838 (Bankr. E.D.N.Y. 2000) (citing *In re Frommann*, 153 B.R. at 117).

### 1. Complexity and Volume of the Business and the Amount of Debtor's Obligations

Debtors first argue that, because the Bagel Store was not a large or complex business and because the amount of debtor's obligation was small, the failure to keep accurate records was excusable. The Bagel Store was a small business; it was not complex and did not engage in an exceptionally large volume of sales. The Bagel Store was initially purchased for $125,000 by the Moreos (Tr. 214:18-19), and was ultimately sold for only approximately $72,000. (Tr. 267:1-2.) The Bankruptcy Court similarly found that the Bagel Store was not a complex business. The Court notes, however, that the small nature of a business is not determinative of the inquiry as to whether a debtor's failure to maintain accurate books and records is justified. Indeed, the fact that a business is small does not, by itself, justify failure to keep records. *See Meridian Bank*, 958 F.2d at 1232; *Baker v. Trachman*, 244 F.2d 18, 20 (2d Cir. 1957). In fact, the Bankruptcy Court stressed that the complexity and volume of the Bagel Store should have been manageable because Mrs. Moreo had employees and an accountant. *See* Sept. 10 Mem. & Order, at 10. This Court agrees.

The amount of the debtors' obligation here was $62,015.71 ($56,000 plus interest). (Tr. 13:10-13, 13:21-25, 320:1-25.) Although this is not as substantial an amount of money as is present in other cases cited by debtors, *see, e.g.*, *In re Cacioli*, 463 F.3d at 235 n.6 ($257,300); *Doubet v. Palermo (In re Palermo)*, 370 B.R. 599, 618 (Bankr. S.D.N.Y. 2007) ($2.7 million), the amount of the obligation was not an insubstantial or trivial amount. Thus, the Court concludes that these factors—the complexity and size of the business and the amount of debt owed by debtors—do not weigh heavily in favor of or against discharge.

### 2. Consideration of the Debtor's Lack of Sophistication

Debtors argue that they were unsophisticated individuals with only a high-school education. Therefore, they argue, any failure to properly maintain business and financial records is excusable. The Court disagrees.

Mrs. Moreo completed only high school education and lacked prior business and accounting experience. (Tr. 208:10-13 ("Q: [D]id you graduate from high school? A: Yes, sir. Q: Okay, did you go to college? A: No , sir.").) Nonetheless, as noted by the Bankruptcy Court, Mrs. Moreo's lack of sophistication was not justified under the circumstances. Mrs. Moreo engaged an accountant who visited the Bagel Store every month or two to discuss the store's business and collect receipts and any other information she provided to him. This should have indicated to her that she should keep a record of her sales to retail and wholesale customers, the business expenses, and the payments she made. The Court thus agrees with the Bankruptcy Court and concludes that Mrs. Moreo's lack of sophistication does not justify her failure to keep accurate records of the Bagel Store's accounts and transactions.

### 3. Customary Record-Keeping Practices in the Debtor's Type of Business

Debtors next argue that the customary practices for record keeping in the Bagel Store's type of business are informal. They thus assert that Mrs. Moreo's record keeping practices were similar to those utilized by others who run bagel stores, and accordingly,

denial of discharge is unwarranted. This argument fails.

"Where the nature of a debtor's business operations indicates that others in like circumstances would ordinarily keep financial records, a debtor cannot justify his failure to maintain records by merely stating that he did not comprehend the need for them or that it was not his practice to keep business records." *Bay State Milling Co. v. Martin (In re Martin)*, 141 B.R. 986, 997 (Bankr. N.D. Ill. 1992)

The Bankruptcy Court found that, when appellee worked at the Bagel Store, he tried to show Mrs. Moreo basic bookkeeping skills. Sept. 10 Mem. & Order, at 13. This is supported by the record. (*See* Tr. 23:8-14.) At trial, debtors presented no evidence of the customary practices of those in debtors' line of business, aside from the assertion that Mrs. Moreo's prior employer paid employees off the books. However, evidence of a practice engaged in by one former employer of Mrs. Moreo is not sufficient to establish a customary business practice. Moreover, paying employees off the books and failing to pay taxes on their salaries is illegal; therefore, this Court declines to entertain debtors' argument that this is an acceptable and customary practice.

Debtors argue that the retail bagel business is a cash business with informal bookkeeping practices; the widespread use of "informal bookkeeping practices," however, does not obviate Mrs. Moreo's duty to record and keep financial and business records, no matter how informally done. Indeed, Mrs. Moreo knew she had to keep some journal or record of such information—she submitted into evidence some of the handwritten journals that she had given her accountant to transfer onto a formal

general journal and balance sheet. *See* Sept. 10 Mem. & Order, at 13.

Debtors "have a duty to preserve those records that others in like circumstances would ordinarily keep. . . . Hence, the debtor's honest belief that he does not need to keep the records in question, or that his records are sufficient, or his statement that it is not his practice to keep additional records, does not constitute justification for failure to keep or preserve records under § 727(a)(3)." *In re Sethi*, 250 B.R. at 839 (citations omitted). The court in *Sethi* noted that:

> [i]f the debtor's transactions were such that others in like circumstances would ordinarily keep financial records, then [the debtor] must show more than that '[he] did not comprehend the need for them and must carry [his] explanation by way of justification to the point where it appears that because of unusual circumstances [he] was under no duty to keep them.

*Id.* (quoting *Frommann*, 153 B.R. at 117). Here, Mrs. Moreo failed to offer a satisfactory explanation as to why she believed she was under no duty to keep better records. Mrs. Moreo acknowledged at trial that she did not have a system for keeping track of receipts and deposits:

> Q: What did you do with the daily receipts when the business checking account no longer existed?
>
> A: I put them in an envelope, in the drawer, like we always did.
>
> Q: And where did you deposit them?

A: I just used it to pay whatever was left over. There was hardly anything left to do.

(Tr. 205:7-13.) Furthermore, as discussed *infra*, despite some awareness that she should be tracking the Bagel Store's finances, Mrs. Moreo made at least some payments by cash from the register as opposed to by checks and failed to keep track of such transactions. (*E.g.*, Tr. 219:9-220:3). Thus, Mrs. Moreo has not shown that she complied with customary practices for record keeping in her line of business. Accordingly, this factor weighs against debtor.

4. Degree of Accuracy Disclosed by Debtor's Existing Books and Records and Whether the Debtor's Failure to Preserve Books and Records Was Due to the Debtor's Fault

The Court must next examine the degree of accuracy disclosed by debtor's existing books and records and whether debtor's failure to preserve books and records was due to debtor's own fault. The Court determines that the books and records submitted by Mrs. Moreo do not provide thorough and accurate records of the Bagel Store's finances. The Court further concludes that the failure to preserve books and records was due in large part to Mrs. Moreo's fault.

When examining the degree of accuracy of a debtor's books and records, the Court is mindful that "the debtor is not required to keep an impeccable system of bookkeeping or records so complete that he can satisfy an expert in business." *In re Sethi*, 250 B.R. at 838 (citing *In re John A. Esposito*, 44 B.R. 817, 826-27 (Bankr. S.D.N.Y. 1984)). The appropriate test is therefore whether "there is available written evidence made and preserved from which the debtor's present financial condition, and his recent business transactions for a reasonable period in the past, may be ascertained with substantial completeness and accuracy." *Id.* (citations omitted).

In support of debtors' argument that the failure to preserve books and records was not their fault, they argue that they hired a CPA to keep books and records and relied on Rossi to help run the business and maintain books and records. Appellants rely heavily on *In re Cacioli*, 463 F.3d 229 (2d Cir. 2006), in support of their argument that discharge is warranted; specifically, they claim that any failure to maintain and produce accurate financial records was justified under the circumstances. The Court disagrees.

In *Cacioli*, the Second Circuit found that the debtor's failure to maintain records was justified because he relied on his partner to maintain the partnership records. The court noted that "[a]s partners, Cacioli and [his partner] share a duty to keep partnership records." *Id.* at 237 (citation omitted). The court further stated that "partners with a shared duty usually delegate responsibilities, including record keeping, among themselves, and a partner's reliance on that delegation is relevant to justification." *Id.* (citation and internal quotation marks omitted). Thus, the Second Circuit found that, in the context of the specific business relationship between Cacioli and his business partner, and under the circumstances of that case, Cacioli's reliance on his partner to maintain accurate financial records was reasonable. *Id.* at 238.

In the instant case, there was no partnership between Mrs. Moreo and Rossi or between Mrs. Moreo and her CPA. Indeed, at trial, Mrs. Moreo acknowledged that she was unable to produce any documents demonstrating that such a partnership existed.

(Tr. 319:5-17.) Thus, the primary responsibility to maintain accurate financial records for the Bagel Store fell on Mrs. Moreo alone. Mrs. Moreo was responsible for the stores books and records.

Mrs. Moreo claims that she relied on their accountant to keep accurate books and records. However, as the Bankruptcy Court noted, the Bagel Store's accountant prepared and filed tax returns based upon the inaccurate and incomplete documents that Mrs. Moreo provided to him:

> The Court: Did you provide [the accountant] with bills and receipts.
>
> The Witness: Sure, yes, yes.
>
> The Court: So he relied on what you gave him, is that correct?
>
> The Witness: Yes.
>
> The Court: Did you tell him about the payment to employees off the books?
>
> The Witness: Yes. He knew. He knew about –
>
> The Court: He knew about it?
>
> The Witness: Yes.
>
> The Court: And he prepared the tax returns reflecting only what the check payments were?
>
> The Witness: Wait, I'm sorry, ma'am. I don't understand.
>
> The Court: Well, if he prepared your tax return from the information you gave him and you said you told him that some of the employees were being paid off the books, where is that reflected in the tax return?
>
> The Witness: I'm not sure. I don't know.
>
> * * *
>
> Q: Then I asked you "Did he rely solely on the checking account statements?" and your answer was "Probably. Ask him, I don't know. I'm not an accountant so I don't know what he did." So, as the Court pointed out, did you give him some document that would tell him here's what I'm doing. I'm taking money and paying my employees out of pocket or out of the register or by some other means that would allow him to have accounted for that. Or did he look solely at the checking account records to make a determination?
>
> A: No, he got the receipts from the envelope all the time. The cash register receipts that were wrapped up, put into the envelope. Anything that was a receipt was put there.
>
> Q: And would you tell him whether or not employees were being paid off the books?
>
> A: No, not really.

(Tr. 219:9-220:3, 222:3-17.) Moreover, it was Mrs. Moreo's responsibility to maintain accurate records—not the accountant's. (*See, e.g.*, Tr. 242:18-25 ("The Court: It's your business. Aren't you responsible for those books and records? And if he had them, you had the duty to obtain them from the accountant if you believed the accountant had it. You're responsible for turning over the

books and records of your business. You can't say somebody else has them and they're there. What records do you have? The Witness: I have what the accountant has."). *See, e.g., In re Cohen*, No. 01-03570 (PCB), 2007 WL 710199, at *6 (Bankr. S.D.N.Y. Mar. 6, 2007) ("Equally without merit is the Debtor's explanation that the requested documents are in the possession of others, including the SEC, the IRS and his former attorney. It is not Trustee's duty to obtain these records. The fact that the Debtor can direct the Trustee where he might obtain the records does not relieve the Debtor of his responsibility to provide the adequate records himself." (citing *In re Jacobowitz*, 309 B.R. 429, 438 (S.D.N.Y. 2004)); *see also In re Harron*, 31 B.R. 466, 470 (Bankr. D. Conn. 1983) ("Even if the Debtor had been keeping appropriate records, his responsibility did not end there. There inheres in the duty to produce records from which the Debtor's financial condition can be ascertained, the duty to take reasonable precautions for the preservation of these records." (quotation omitted)).

There was ample evidentiary support for the Bankruptcy Court findings that: (1) Mrs. Moreo failed to keep accurate & complete financial records of the business transactions at the Bagel Store (*e.g.*, Tr. 222:3-17); (2) the financial records produced by Mrs. Moreo at trial were incomplete and the records proffered did not reflect all payments made (Tr. 222:18-24); (3) Mrs. Moreo made at least some payments to vendors and her employees by cash from the register as opposed to checks, and knowingly reported only some and not all of the wages paid (*e.g.*, Tr. 219:9-220:3); and (4) Mrs. Moreo stated that she had a book in which she kept track of how much money came in and went out each day, but she did not submit this book into evidence (Tr. 221:21-25, 240:9-19, 241:17-23). *See also* Sept. 10 Mem. & Order, at 11.

The Moreos also do not dispute the following: (1) Mrs. Moreo did not keep any ledger or formal records of her receipts, expenses or payments (Tr. 223:5-20. ("Q: Now, what'd you do with all those envelope receipts? A: When he came, he would have them. Q: And after that what'd you do with them? A: He would take them and he would do all his accounting. Q: Did he ever give them back to you? A: No. Q: So they were gone? A: Yes. Q: You didn't maintain them. A: No. Q: You didn't see any reason to. A: No. Q: They were the books and records of your business, were they not? A: Yes. And the checking account and his books.")); (2) Mrs. Moreo testified that there was not an exact ledger, it was very chaotic, and she did not know how to take care of the books (Tr. 221:15-19); (3) Mrs. Moreo did not make daily deposits of her cash receipts from the Bagel Store into the bank account and any deposits into the business account was infrequent (Tr. 237:1-18, 237:25-238:24); (4) Mrs. Moreo would take the money at the Bagel Store home rather than deposit the money into the business checking account (Tr. 201:6-203:25, 205:7-23, 237:1-18, 237:25-238:24); (5) retail sales would be recorded on the cash register but there was no evidence that all cash transactions relating to the wholesale customer accounts were recorded (Tr. 22:14-23:4, 48:1-4); (6) vendors or employees were occasionally paid in cash from the cash register, and not all of these payments to employees were recorded (Tr. 219:9-220:3, 237:1-18); and (7) Mrs. Moreo failed to produce at trial any envelopes or receipts pertaining to wholesale accounts and expenses that she claimed she would save and deliver to her accountant each month (Tr. 242:2-17). *See also* Sept. 10 Mem. & Order, at 2.

Moreover, as the Bankruptcy Court noted, in a cash-based business such as the Bagel

Store, accurate and complete record keeping is necessary in order for creditors to determine the financial condition and business transactions of the business and to determine the sales and withholding taxes that are due to the taxing authorities. *Id.*

The scant records provided by debtors were insufficient to provide the Bankruptcy Court with an accurate picture of the Bagel Store's accounts and finances. The Bankruptcy Court stressed that it was unable to determine how much revenue the Bagel Store generated, what expenses were incurred, which expenses were paid in cash and which were paid by check, the amount of those payments and whether those payments were appropriate, the net profit/loss generated by the Bagel Store and the cash flow of the business—all as a result of Mrs. Moreo's failure to maintain accurate books, documents, records, and papers from which the Bagel Store's financial condition or business transactions could be ascertained. *Id.* at 12. In addition, the Bankruptcy Court noted that, because some of the debtors' unsecured debt related to their liability with respect to the Bagel Store, the inability of the Bankruptcy Court and creditors to determine the defendants' business transactions was material. *Id.*

Debtors attempt to place the fault for their failure to produce accurate and complete financial records on others—namely, they note that Mrs. Moreo hired a CPA to keep books and records and relied on Rossi to help run the business and maintain books and records. However, this argument is without merit and is contrary to the factual findings of the Bankruptcy Court, which debtors do not dispute and which are supported by the record. The Bankruptcy Court found that "Rossi never saw any of the books and records of the Bagel Store and did not see Mrs. Moreo prepare a ledger. . . . He allegedly did his own

bookkeeping with respect to the Bagel Store to determine how the business was doing although the Court does not have any evidence of such bookkeeping." Sept. 10 Mem. & Order, at 4. It is the debtor who has the burden of producing records that indicate her financial position. *See In re Sethi*, 250 B.R. at 838, 841 (citing *Nisselson v. Wolfson (In re Wolfson)*, 139 B.R. 279, 286 (Bankr. S.D.N.Y. 1992)); *see also id.* at 841 (denying discharge because "[t]he obligation to provide adequate records of these transactions lies with the debtor. Here, no records have been provided"). The Court further notes that, although debtors attempt to argue that the lack of financial records is not Mrs. Moreo's fault, cases finding that the failure to produce records was not due to the debtor's fault generally involve destruction of documents due to circumstances beyond the debtor's control, such as fire or theft. *See id.* at 840. Debtors do not allege that any such circumstances are present here. A debtor must do more than "profess a belief that her records were sufficient or that it was not her practice to keep additional records." *See Fromann*, 153 B.R. at 117 (collecting cases). Mrs. Moreo has not done so here. Accordingly, Mrs. Moreo's failure to produce accurate and complete financial and business records weighs heavily against discharge.

### 5. The Extent of Any Egregious Conduct on the Debtor's Part & the Debtor's Courtroom Demeanor

An intent to conceal one's financial information is not necessary to support a denial of discharge under § 727(a)(3). *In re Underhill*, 82 F.2d 258, 259 (2d Cir. 1936). However, the Court may examine other facts and circumstances surrounding a debtor's actions and weigh any egregious conduct on the debtor's part in determining whether

denial of discharge is warranted under § 727(a)(3).

Mrs. Moreo was untruthful when she filed tax returns based upon inaccurate and incomplete financial records. Employees at the Bagel Store were typically paid off the books, thus avoiding taxes on these payments:

> Q: And both of those [employees], you testified at your deposition, were paid off the books, is that correct?
>
> A: Yes. On and off.
>
> Q: Mostly off?
>
> A: Yes.

(Tr. 215:7-11.)    Mrs. Moreo further acknowledged that she did not pay taxes for all of her employees:

> Q: It's the government who'd be collecting the taxes on those salaries. Did they?
>
> A: Not on salaries.
>
> Q: You didn't pay any salaries – you didn't pay any taxes on that money, did you?
>
> A: No, we just paid it on whatever people were on the books.

(Tr. 210:22-211:2.)

In fact, debtors acknowledge that some expenses were paid in cash, and Mrs. Moreo was a "willing and admitted participant" to that conduct. (Appellants' Mem. of Law, at 3.) During examination by the Bankruptcy Court, Mrs. Moreo also acknowledged that she deposited checks payable to the business into a personal account. (Tr. 203:13-15 ("The Court: So, you're saying that a check payable to the business was deposited into a personal account? The Witness: Yes."); 203:24-204:1 ("Q: So you took the funds that belonged to the business and you deposited them into your personal account. A: Yes.").) Moreover, during Mrs. Moreo's testimony, it appeared that there may have been additional unaccounted-for expenses and profits of the Bagel Store that were missing from the bankruptcy petition:

> Q: How did you manage to change the margins so significantly in a year?
>
> A: I wouldn't know how to answer that.
>
> Q: Well, that's a significant savings. That's almost half. What year did Mr. Rossi come to you?
>
> A: 2000 – the end of 2004, the beginning of 2005.
>
> Q: How—if I looked at this, I would believe that your margins increased by almost twenty percent in the year, yet your bottom line didn't improve at all. Why is that?
>
> A: What is the bottom line?
>
> Q: Profitability. . . . Can you explain that?
>
> A: No, we were still paying the same rent, we were still paying the same bills, we were still paying the same suppliers, and so I don't know.
>
> Q: Is it a possibility that money was just simply not getting recorded?
>
> A: No.

Q: No?

A: Absolutely not.

Q: Yet there isn't a document before the Court that you can point to that shows that. Is that correct?

A: These are the books in the records, and it was just very, very hard . . . .

(Tr. 257:15-258:14.) Accordingly, the Court concludes that the existence of other egregious conduct by Mrs. Moreo weighs heavily against granting a bankruptcy discharge.

\* \* \*

The records presented by a debtor must "be such as to allow the Trustee, the creditors, and the court to meaningfully reconstruct debtor's financial status." *In re Goldstein*, 123 B.R. 514, 525 (Bankr. E.D. Pa. 1991). Here, the Bankruptcy Court was unable to meaningfully reconstruct the financial status of the Bagel Store. *See* Sept. 10 Mem. & Order, at 12 ("Based upon the documents provided by the [debtors], the Court is unable to determine how much revenue the Bagel Store generated, what expenses were incurred, which expenses were paid in cash and which were paid by check, the amount of those payments and whether those payments were appropriate, the net profit/loss generated by the Bagel Store, and the cash flow of the business."). Moreover, Mrs. Moreo did not offer sufficient justification for her failure to provide more accurate and complete information. Accordingly, having reviewed the Bankruptcy Court's determination under a *de novo* standard of review, the Court concludes that the Bankruptcy Court properly denied discharge to Mrs. Moreo under § 727(a)(3). *See Pereira v. Gardner (In re Gardner)*, 384 B.R. 654, 666 (Bankr. S.D.N.Y. 2008) (denying discharge under § 727(a)(3)

when the Trustee credibly testified that the "Debtor was uncooperative, that the Debtor failed to disclose the existence of the timeshares, and that the records the Debtor did produce were inadequate to understand or explain the Debtor's business and financial condition"); *Doubet v. Palermo (In re Palermo)*, 370 B.R. 599, 617 (Bankr. S.D.N.Y. 2007) (denying discharge under § 727(a)(3) when debtor "did not maintain records of his financial transactions, and his accountings [were] fraught with inaccuracies and inconsistencies"); *In re Frommann*, 153 B.R. at 115, 119 (denying discharge when the debtor provided the Trustee "with a morass of records consisting of bills, checks, bank statements and closing statements," but "no books of account were furnished to the Trustee").

IV. SECTION 727(A)(4)(A)

The Bankruptcy Court also denied Mr. and Mrs. Moreo discharge under 11 U.S.C. § 727(a)(4)(A), which provides for denial of discharge if a debtor makes a false oath or account in connection with her bankruptcy petition. For the reasons set forth below, the Court affirms the Bankruptcy Court's conclusion.

A. The Legal Framework under Section 727(A)(4)(A)

Section 727(a)(4)(A) provides the following:

(a) The court shall grant a debtor a discharge, unless –

(4) the debtor knowingly and fraudulently, in or in connection with the case –

(A) made a false oath or account.

11 U.S.C. § 727(a)(4)(A). A debtor's bankruptcy petition and the accompanying schedules constitute statements under oath for purposes of this Section. *See, e.g.*, *Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 320 (Bankr. S.D.N.Y. 1994). The Second Circuit has made clear that a denial of discharge pursuant to § 727 is a severe sanction and must be construed strictly in favor of the debtor. *See In re Chalasani*, 92 F.3d at 1310 (citation omitted).

Therefore, it is well established that to prove an objection to discharge under § 727(a)(4)(A), the party objecting to discharge must establish by a preponderance of the evidence that: "(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew that the statement was false; (4) the debtor made the statement with intent to deceive; and (5) the statement related materially to the bankruptcy case." *Dubrowsky v. Estate of Perlbinder (In re Dubrowsky)*, 244 B.R. 560, 572 (E.D.N.Y. 2000) (citations omitted). Once the moving party meets its initial burden to produce evidence of a false statement, the burden of production shifts to the debtor to produce a "credible explanation." *Casa Invs. Co. v. Brenes (In re Brenes)*, 261 B.R. 322, 334 (Bankr. D. Conn. 2001). However, the overall burden of proof remains with the moving party. *See., e.g.*, *BTE Concrete Formwork, LLC v. Arbaney (In re Arbaney)*, 345 B.R. 293, 301 (Bankr. D. Colo. 2006).

## B. The Bankruptcy Court's Findings

The Bankruptcy Court determined that a denial of discharge for the debtors was warranted under 11 U.S.C. § 727(a)(4)(A). Specifically, the Bankruptcy Court determined that the debtors had the requisite knowledge and intent under 11 U.S.C. § 727(a)(4)(A) with respect to the false or inaccurate statements made in connection with their submissions to the Bankruptcy Court—in particular, their omission of three lawsuits from Schedule B, their failure to list Mr. Moreo's 100% shareholder interest in the Bagel Store on their original schedules, and their inclusion of a $175 telecommunications bill on their Means Test. The Court first discusses the Bankruptcy Court's findings with respect to each misstatement.

### 1. Personal Injury and Workers' Compensation Claims

The Bankruptcy Court found that the debtors had failed to list three lawsuits on their original Schedule B. On January 31, 2008, they filed an Amended Schedule B. Specifically, debtors added a personal injury lawsuit against Frank Capella relating to a motor vehicle accident on July 23, 2003 with a value of $7,500, a personal injury lawsuit against Beach Bar, Inc., for an accident that occurred on February 23, 2005 with a value of $15,000, and a workers' compensation claim against Mr. Moreo's employer for an accident that occurred on February 23, 2005 with a value of $7,500. Sept. 10 Mem. & Order, at 6. (Tr. 198:17-199:3.) In his testimony, Mr. Moreo stated that he subsequently revealed the existence of these lawsuits because "[a]s [he] was being questioned by [his] lawyer, [the lawyer] asked [him] many questions regarding lawsuits and [Mr. Moreo] told him about these lawsuits." (Tr. 88:21-23.) The Bankruptcy Court noted that these were prepetition claims that debtors knew about and failed twice to list in their Schedules when asked about whether they had any contingent and unliquidated claim of any nature. *See* Sept. 10 Mem. & Order, at 16. The Bankruptcy Court concluded that the failure to list these lawsuits was material, and that "[t]he failure of the Trustee at the meeting of creditors to question whether the [debtors]

had any potential or existing claims against third parties does not excuse [their] failure to disclose such potential assets. *Id.* at 15-16.

### 2. Mr. Moreo's Shares in the Bagel Store

The debtors also failed to list Mr. Moreo as a 100% shareholder of Moreo's Bagel & Café in their original Schedule B. (Tr. 89:21-25, 90:11-15, Tr. 199:6-21.) The Bankruptcy Court determined that, although Mr. Moreo's shares were of no value because the debtors had sold the assets of the Bagel Store prepetition, the determination of whether Mr. Moreo's shares were relevant or important to the bankruptcy is a determination that should be made by the Trustee, not the debtor. *See* Sept. 10 Mem. & Order, at 15.

### 3. Inappropriate Deductions in the Means Test

The Bankruptcy Court found that debtors' bankruptcy court submissions included a third false oath relating to their Means Test deductions. Specifically, one of the deductions debtors listed on their Means Test was $175 for telecommunication services other than basic home telephone service. This expense was comprised of $40 for a cell phone and $135 for the family's cable television bill. The Bankruptcy Court noted that this expense was included without an explanation as to how such an expense would be related to the health and welfare of debtors or their dependents and further demonstrated debtors' reckless disregard for the truth. *See* Sept. 10 Mem. & Order, at 16.

\* \* \*

The Bankruptcy Court concluded that Rossi established that the debtors intentionally made a false oath by a preponderance of the evidence and that the debtors failed to provide

credible justifications for their erroneous and misleading statements in the Schedules and Amended Means Test. Sept. 10 Mem. & Order, at 16. As set forth below, the Bankruptcy Court did not err in finding that the debtors made the inaccurate statements and omissions with the intent to deceive, or a reckless indifference to the truth. As it regards a question of fact, this determination is reviewed for clear error, with deference given to the Bankruptcy Court's opportunity to judge the credibility of the debtors and any other witnesses. *See U.S. Lines, Inc. v. Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. (In re U.S. Lines, Inc.)*, 197 F.3d 631, 640-41 (2d Cir. 1999). This Court concludes that there was sufficient evidence in the record to support the reasoned conclusion by the Bankruptcy Court.[1]

### C. Failure to List Lawsuits on Schedule B

The Bankruptcy Court found that the failure to list the three lawsuits on Schedule B was a false oath that related materially to the debtors' bankruptcy estate. Sept. 10 Mem. & Order, at 16. Whether or not a debtor has made a false oath within the meaning of 11 U.S.C. § 727(a)(4)(A) is a question of fact. *In re Boyer*, 328 F. App'x 711, 715 (2d Cir. 2009) (citations omitted). The Court determines that the debtors' omission of the lawsuits from Schedule B was a material false statement under oath, made knowingly with fraudulent intent. Specifically, the five factors necessary to establish that discharge was not warranted under 11 U.S.C. § 727(a)(4) were present: (1) the debtors made a statement under oath; (2) the statement was false; (3) the debtors knew that the statement was false; (4) the debtors made the statement with intent to

---

[1] Even if this Court reviewed this determination under a *de novo* standard of review, it would reach the same determination for the reasons discussed *infra*.

deceive; and (5) the statement related materially to the bankruptcy case. *See Dubrowsky*, 244 B.R. at 572 (citation omitted). The Court examines these elements below.

### 1. Element 1: Statement Under Oath

First, the omission of the lawsuits from debtors' Schedule B was a statement made under oath. Statements under oath include statements in documents filed with the Bankruptcy Court, such as the bankruptcy schedules and statement of financial affairs filed with the petition and statements by the debtor during examinations under oath, such as testimony during the meeting of creditors held pursuant to § 341(a). *In re Steinberg*, 143 F.2d 942, 942-43 (2d Cir. 1944) (concluding that, where there was evidence that debtor knowingly omitted certain creditors from schedule of debts annexed to his petition in bankruptcy, denial of discharge was required without proof as to any fraudulent purpose); *see also In re Argenti*, 391 B.R. 671, 675 (Bankr. D. Conn. 2008); *Montey Corp. v. Maletta (In re Maletta)*, 159 B.R. 108, 112 (Bankr. D. Conn. 1993)). Each debtor must sign a Declaration Concerning Debtor's Schedules, which states:

> I, the [the president or other officer or an authorized agent of the corporation or a member or an authorized agent of the partnership] of the [corporation or partnership] named as debtor in this case, declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of _____ sheets (Total shown on summary page plus 1), and that they are true and correct to the best of my knowledge, information, and belief.

*See* B6 Decl., *available at* http://www.uscourts.gov/FormsAndFees/For

ms/BankruptcyForms.aspx. Both omissions and affirmative misstatements qualify as false statements under § 727(a)(4)(A). *See, e.g.*, *In re Steinberg*, 143 F.2d at 943. Accordingly, the debtors' failure to list three lawsuits on their original Schedule B was a statement made under oath.

### 2. Element 2: False Statement

Second, the original Schedule B that debtors submitted, which did not contain the lawsuits, was false. Schedule B instructs bankruptcy petitioners to "list all personal property of the debtor of whatever kind." Schedule B, *available at* http://www.uscourts.gov/FormsAndFees/Forms/BankruptcyForms.aspx. Schedule B specifically requests that debtors include "contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims." *Id.* Nonetheless, the Moreos neglected to include three lawsuits from which they had such claims from their Schedule B:

> Q: I want you to look at page 67 and tell me, there are now answers to question number 21 that indicate three separate lawsuits, is that correct?
>
> A: Yes.
>
> Q: And there's a personal injury action, a personal injury lawsuit, and a workers' comp claim, is that correct?
>
> A: Yes.
>
> Q: And those were not included when you filed the original schedule either?
>
> A: No.

(Tr. 90:16-25; *see also* Tr. 198:17-199:3.) Thus, debtors acknowledged that their original Schedule B contained a false statement, because it neglected to include "all personal property" of the debtors—namely, *inter alia*, three lawsuits.

### 3. Elements 3 and 4: Knowledge and Intent to Deceive

#### (a) Legal Standard

In order to deny a debtor discharge under § 727(a)(4)(A), the debtor's fraudulent statement must have been made with knowledge and with fraudulent intent to deceive. The knowledge requirement is satisfied by showing that "the bankrupt knows what is true and, so knowing, wilfully and intentionally swears to what is false." *In re Kaufhold*, 256 F.2d 181, 185 (3d Cir. 1958) (citing *Tancer v. Wales*, 156 F.2d 627, 628 (2d Cir. 1946); *Aronofsky v. Bostian*, 133 F.2d 290 (8th Cir. 1943); *Morris Plan Indus. Bank v. Henderson*, 131 F.2d 975, 977 (2d Cir. 1942); *Willoughby v. Jamison*, 103 F.2d 821 (8th Cir. 1939)).

"Fraudulent intent must be shown by actual, not constructive fraud. The party objecting to the discharge must show that the information was omitted for the specific purpose of perpetrating a fraud and not simply because the debtor was careless or failed to fully understand his attorney's instructions . . . ." *In re Dubrowsky*, 244 B.R. at 571-72 (internal citations omitted). A debtor shall be denied a discharge if he is found to have exhibited a "reckless indifference to the truth." *Painewebber Inc. v. Gollomp (In re Gollomp)*, 198 B.R. 433, 438 (S.D.N.Y. 1996) (citing *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir. 1987)); *see In re Dubrowsky*, 244 B.R. at 576 ("[I]t is important to note that under section 727(a)(4)(A), a reckless indifference to the truth is sufficient to sustain an action for fraud." (citations omitted)); *Castillo v. Casado (In re Casado)*, 187 B.R. 446, 450 (Bankr. E.D.N.Y. 1995) ("Successful administration of the Bankruptcy Act hangs heavily on the veracity of statements made by the Bankrupt . . . . [R]eckless indifference to the truth . . . is the equivalent of fraud." (citing *Diorio v. Kreisler-Borg Constr. Co. (In re Diorio)*, 407 F.2d 1330, 1331 (2d Cir. 1969))); *see also Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1584 n.4 (2d Cir. 1983); *Nisselson v. Wolfson (In re Wolfson)*, 139 B.R. 279, 288 (Bankr. S.D.N.Y. 1992), *aff'd*, 152 B.R. 830, 836 (S.D.N.Y. 1993). The Second Circuit has recognized that fraudulent intent may be inferred from a series of incorrect statements and omissions contained in the schedules. *In re Dubrowsky*, 244 B.R. at 576. Moreover, "while subsequent disclosure before an objection to discharge is filed may be some evidence of innocent intent, . . . the effect of a false statement is not cured by correction in a subsequently filed schedule." *Weiss v. Winkler*, No. 98-CV-5742, 2001 WL 423050, at *3 (E.D.N.Y. Mar. 30, 2001) (citations and quotations omitted).

#### (b) Application

The Court next examines the Moreos' knowledge and intent with respect to the omission of the lawsuits on Schedule B. "Where it reasonably appears that the oath is false, the burden falls upon the debtor to come forward with evidence to prove that it was not an intentional misrepresentation. If the debtor fails to provide such evidence or a credible explanation for his failure to do so, a court may infer fraudulent intent." *Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 228 (E.D.N.Y. 2000) (quoting *In re Gollomp*, 198 B.R. 433, 437 (S.D.N.Y. 1996)). The Moreos have acknowledged that the original Schedule B was false because it failed to list the lawsuits. They do not argue

that they did not have knowledge of the lawsuits at the time of filing for bankruptcy. The Court concludes, and it is undisputed, that debtors' original Schedule B was false. On the vital issue of fraudulent intent, as discussed below, there was more than sufficient basis for the Bankruptcy Court to infer fraudulent intent from the circumstances and to conclude that debtors have not provided a reasonable explanation for their failure to include the lawsuits on Schedule B.

The Moreos attempt to provide a reasonable explanation for their false filing. Specifically, they argue that the omission was an unintentional error and that "corrective disclosure was made before the plaintiff discovered the omission," Sept. 10 Mem. & Order, at 15, and thus, no fraudulent intent may be inferred. Debtors further argue that a debtor coming forward of his or her own accord to correct an omission is strong evidence that there was no fraudulent intent in the omission.

Although debtors subsequently disclosed the existence of the three lawsuits (and, as discussed *infra*, subsequently disclosed Mr. Moreo's 100% shareholder ownership of the Bagel Store), the effect of a false statement is not necessarily cured by correction in an amended schedule or by subsequent testimony. *In re Tabibian*, 289 F.2d 793, 796-97 (2d Cir. 1961) ("The untruthful answer on the schedule of his affairs, denying any transfers in the year before bankruptcy, is much more serious. The referee felt that the false answer in the petition was 'cured' by his subsequent testimony at the first meeting of creditors. As a 'rule of law,' stated broadly, the referee was incorrect."); *see also In re Strickland*, 350 B.R. 158, 164 (Bankr. D. Del. 2006). The Court acknowledges that "in determining the bankrupt's state of mind, the [Bankruptcy Judge is] entitled to consider the later disclosure as *some* evidence of innocent

intent." *In re Tabibian*, 289 F.2d at 797 (emphasis added). However, in light of the entire record, the Court concludes that the Bankruptcy Court did not err when it found that debtors possessed the requisite knowledge and fraudulent intent when they failed to disclose the existence of these three lawsuits. First, the Court further notes that debtors did not amend their Schedule B until after this adversary proceeding was filed.[2] They had previously filed their original petition and an amended petition that failed to disclose the existence of these lawsuits. Thus, their voluntary disclosure of the existence of the lawsuits does not bear as much weight as they would contend.

The Court is mindful that "on the issue of the alleged 'false oaths,' the credibility of the bankrupt is a very important factor." *Id.* at 795. Nonetheless, the Bankruptcy Court, which had an opportunity to observe debtors' demeanor and testimony firsthand, found that debtors demonstrated an indifference and disregard of the Bankruptcy Code. Sept. 10 Mem. & Order, at 16. This finding was not clearly erroneous. After an independent review of the record, this Court reaches the same conclusion. For example, in addition to the numerous omissions on debtors' Schedules and other filings, the testimony at the hearing in Bankruptcy Court demonstrates that Mr. Moreo was evasive when questioned by opposing counsel. (*See*, *e.g.*, Tr.86:2-21; 102:1-8.) Moreover, as discussed *infra*, there was evidence that debtors failed to disclose additional assets that were not discussed in the September 10 Memorandum and Order. The Court further notes that, although somewhat

---

[2] Specifically, Rossi filed the instant adversary proceeding on October 5, 2007. Debtors did not amend their Schedule B to include the three lawsuits and Mr. Moreo's 100% shareholder interest in the Bagel Store until January 31, 2008.

unsophisticated regarding financial matters, Mr. Moreo had filed for bankruptcy before:

> Q: So you had previously gone through a bankruptcy filing. And in the '98 bankruptcy, did you use an attorney at that time as well?
>
> A: Yes
>
> Q: Okay. So you're somewhat familiar with the process?
>
> A: I guess.
>
> Q: Is that a yes or a no.
>
> A: Yes.

(Tr. 83:23-84:5.) Although debtors only had a high-school level education,[3] they were represented by counsel throughout their bankruptcy proceeding. They discussed the forms that they filed with the Bankruptcy Court with their counsel. Furthermore, as noted by the Bankruptcy Court, the purportedly unsophisticated debtors engaged in other fraudulent behavior: they disregarded federal and local tax laws by paying employees of the Bagel Store off the books and failing to report these payments. (Tr. 210:22-211:2; *see also* Tr. 20-22.)

Moreover, as discussed *infra*, the aggregate of misstatements and omissions of fact can demonstrate a pattern of reckless disregard for the truth and intent of concealing information from the Court and its creditors. *See Metro Connections v. Shah (In re Shah)*, 388 B.R. 23, 38-39 (Bankr. E.D.N.Y. 2008) ("Each of these facts taken individually may not rise to the level of materiality, but cumulatively, they show a pattern of deceit."). As discussed more fully below, here, as in *Shah*, the debtors have:

> clearly exhibited a reckless indifference to the truth with respect to the information contained in the Schedules and Statement of Financial Affairs. These omissions and misstatements go beyond mere carelessness and provide sufficient grounds for finding that the [debtors] acted with fraudulent intent. The fact that the [debtors] did correct [their] failure to list [certain items] does not absolve [them] . . . .

*Id.* at 38-39. Accordingly, the Court concludes that debtors filed Schedule B with a reckless indifference to the truth.

Accordingly, the Bankruptcy Court did not err in concluding that debtors had the requisite knowledge that the answers they provided on this question in Schedule B were false. *See In re Casado*, 187 B.R. at 449 ("With respect to the failure to list lawsuits, the Debtor claims that his English is poor and that he did not understand that lawsuits which he was in the process of settling were to be listed. However, the Debtor has been in the United States since 1960 and is a practicing medical surgeon. He reads medical records and prescribes medicines. He consults with other doctors in regard to health issues and the condition of his patients. The Debtor appears to thus know and understand English quite well and knew or should have known that the answers that he provided to some of the questions in the schedules and statement of affairs were false."); *In re Bodenstein*, 168 B.R. 23, 29 (Bankr. E.D.N.Y. 1994); *In re Ishahak*, 130 B.R. 16, 19 (Bankr. E.D.N.Y.

---

[3] In determining whether the debtor made a false statement with the intent to deceive, the Court can consider, among other factors, the debtor's level of financial sophistication. *In re Smorto*, 2008 WL 699502, at *5.

1991); *In re Rodriguez*, 29 B.R. 537, 541 (Bankr. E.D.N.Y. 1983). Thus, this Court agrees with the Bankruptcy Court that debtors acted with the requisite level of knowledge and intent for denial of discharge under § 727(a)(4)(A). *See, e.g.*, *In re Ford*, 492 F.3d 1148, 1156 (10th Cir. 2007) (affirming bankruptcy court's finding that the debtor "intentionally concealed her potential litigation interest and that the concealment prejudiced the Trustee's administration of the estate" because the record supported a finding of the debtor's bad faith and potential value to the litigation).

4. Element 5: Materiality of the Statement

Finally, debtors' omission was materially related to the bankruptcy case. An item is material if it is related to the debtor's "business transactions or estate which would lead to the discovery of assets, business dealings, or existence or disposition of property." *In re Murray*, 249 B.R. at 228, 230 (quoting *In re Sawyer*, 130 B.R. 384, 394 (Bankr. E.D.N.Y. 1991)). "Virtually every imaginable asset becomes property of the estate upon the filing of a bankruptcy petition." *Id.* at 230. "Lying about assets that are part of the estate—even if possibly exempt—certainly bears a relationship to the estate." *Id.* Here, the three lawsuits were materially related to the estate. The debtors were required to list them on their schedules and statement of financial affairs. *See, e.g.*, *In re Casado*, 187 B.R. at 449 ("[T]he Debtor is required to notify creditors through the schedules and statement of financial affairs of any litigation in which he is involved."). The existence of each of these lawsuits had potential value that would affect the disposition of property of the estate: specifically, the three lawsuits consisted of a personal injury lawsuit against Frank Capella relating to a motor vehicle accident on July 23, 2003 with a value of $7,500, a personal injury

lawsuit against Beach Bar, Inc., for an accident that occurred on February 23, 2005 with a value of $15,000, and a workers' compensation claim against Mr. Moreo's employer for an accident that occurred on February 23, 2005, with a value of $7,500. Sept. 10 Mem. & Order, at 7. The Court further notes that "[d]ebtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or unavailable. This is because the bankruptcy court, not the debtor, decides what property is exempt from the bankruptcy estate." *In re Murray*, 249 B.R. at 231 (quoting *In re Bailey*, 147 B.R. 157, 163 (Bankr. N.D. Ill. 1992) (internal quotations and citations omitted)). Thus, it is no excuse to allege that debtors were not aware that they were required to list such lawsuits. Accordingly, the Court concludes that debtors' failure to list three lawsuits on their Schedule B were material omissions under § 727(a)(4)(A).

E. Other Fraudulent Representations

The Court thus concludes that debtors' misrepresentations regarding the lawsuits alone would have been sufficient grounds upon which to deny the debtors discharge. Nonetheless, even assuming that the failure to list three lawsuits on Schedule B was not sufficient grounds upon which to find a false oath warranting a denial of discharge, the cumulative of debtors' misrepresentations and omissions throughout the Bankruptcy Court proceedings provides additional grounds for the Bankruptcy Court's denial of discharge under § 727(a)(4)(A). The aggregate of "misstatements and omissions of fact can demonstrate a pattern of reckless disregard for the truth and intent of concealing information from the Court and its creditors." *In re Shah*, 388 B.R. at 38 (citation omitted)

The Court notes that, in addition to the failure to disclose three lawsuits on their schedules, debtors also failed to disclose Mr. Moreo's 100% shareholder ownership of the Bagel Store:

Q: I want you to look at question number 13. Do you see an indication there that you had any interest in the bagel store?

A: I see the question.

Q: Okay. Is there an answer to it?

A: It says "No."

\* \* \*

Q: Did you not have an interest in the bagel store when you filed the petition originally on April of '07?

A: Yes, I did.

Q: Okay. So that was just omitted, is that your testimony?

A: Yes. I guess so.

(Tr. 89:21-25; 90:11-15.)

Debtors argue that at the time of the filing of the bankruptcy petition, debtors' bagel business was already sold and that transaction was accurately disclosed and detailed in debtors' Statement of Financial Affairs at paragraph 18. (*See* Record on Appeal, Docket Entry [1], #1.) Accordingly, they claim that they did not believe they were required to list Mr. Moreo's ownership of the Bagel Store on the schedules or statement of financial affairs because it had no value. An amendment was thereafter made to Schedule B line 13 by adding the 100% shareholder stake in the Bagel Store at zero value. Debtors argue that,

while the corporation still exists, its assets were sold. "Generally speaking, a debtor who, without fraud, [fails] to schedule property at no value is not guilty of making a false and fraudulent oath." Collier's on Bankruptcy § 727.04(2) (15th ed.). However, the Court notes that "lying about worthless assets is material [if] the misstatements 'relate to the [debtors'] assets and business dealings, and taken as a whole are misleading to both the court and the creditors as to the nature and extent of the [debtors'] business transactions and estate." *In re Shah*, 388 B.R. at 39 (quoting *In re Murray*, 249 B.R. at 228). Lies about assets of the estate, even if they are exempt or worthless, may be sufficient to warrant denial of discharge. *See Morris Plan Indus. Bank v. Finn*, 149 F.2d 591, 592 (2d Cir. 1945) (per curiam) (concluding that intentional non-disclosure of exempt property is sufficient to deny discharge because creditors are "entitled to judge for themselves from a true account of the facts, what will benefit, and what will prejudice, them"); *see also, e.g.*, *Mertz v. Rott*, 944 F.2d 596, 598-99 (8th Cir. 1992) (concluding that non-disclosure of exempt tax refund was material because it was an "asset" of the estate, and denying discharge); *In re Murray*, 249 B.R. at 230-31 ("[N]on-disclosure of exempt property fits squarely within the definition of material discussed above.") (concluding that failure to disclose arguably exempt property was material); *In re Sapru*, 127 B.R. 306, 316 (Bankr. E.D.N.Y. 1991) (concluding that non-disclosure of exempt or worthless assets was material because the fraudulent representations "relate to the Debtor's assets and business dealings, and taken as a whole are misleading to both the court and the creditors as to the nature and extent of the Debtor's business transactions and estate"). The Court further notes that the goodwill associated with the business could have value independent from the assets of the Bagel Store, and that this

determination of its value should be made by the Bankruptcy Court, not by debtors. *Cf. In re Vecchitto*, 229 F.3d 1136, 1136 (2d Cir. 2000) ("[W]e see no error in the Bankruptcy Court's finding that the stock had no market value because VMG's goodwill had no value, since neither shareholder was bound by a covenant not-to-compete. The trustee argues that this determination is inconsistent with *In re Prince*, 85 F.3d 314 (7th Cir.), *cert. denied*, 519 U.S. 1040 (1996), which held that goodwill is not to be excluded as a matter of law simply due to the absence of a covenant not-to-compete. We agree with the Bankruptcy Court that it did not automatically exclude goodwill as a matter of law, but rather determined that, under the facts of this case, VMG's goodwill had no value. The court based its determination on testimony about the risk of VMG losing its client base. This type of case-by-case inquiry is exactly what *Prince* calls for.").

The Court also notes, and debtors do not dispute that, they amended their Means Test Calculation to include a $3,500 loan from Mrs. Moreo's brother, which averaged $583.33 a month over a six-month period; $308.38 in income from the operation of the Bagel Store; and an additional child that was mistakenly excluded from their current household size. Sept. 10 Mem. & Order, at 7. (Tr. 108:18-24.) This amendment necessitated a deduction that resulted in the debtors' annualized current monthly income being more than the applicable median family income and necessitated a calculation of allowed deductions under § 707(b)(2). Sept. 10 Mem. & Order, at 7.[4]

The Court further notes that there was other evidence in the record that suggested that debtors misrepresented their assets on their bankruptcy filings:

> Q: Okay. And now I want you to look back at the deposit for the $2448.57 on January 16th of 2007 and there the description only says "customer deposit." Can you explain why

$135 for cable television and internet. (Tr. 131:10-25.) However, the Bankruptcy Court found that no evidence supported that these expenses were related to the health and welfare of the debtors and their dependents, and thus should not have been listed. Sept. 10 Mem. & Order, at 7. Debtors argue that the inclusion of the telecommunications charges was proper because, as debtors testified before the Bankruptcy Court, Mrs. Moreo has multiple sclerosis. (Appellants' Br. at 8.) Thus, debtors argue that the taking of the deduction was proper. (*Id.*) Alternatively, debtors argue that taking a means test deduction should not be considered a false oath made with fraudulent intent.

The Court notes that debtors have failed to offer a satisfactory explanation for their inclusion of the telecommunications expenses on their Means Test. Moreover, misrepresentations on the means test may be found to be false oaths with fraudulent intent. *See, e.g.*, *In re Crumley*, 428 B.R. 349, 365 (Bankr. N.D. Tex. 2010) ("Similarly, in the means test calculation of current monthly income for Form B22A, the Debtors did not include any of the gifts received from Mr. Crumley's father in the six months prior to filing the petition. As stated above, omissions and misstatements of income and expenses are material." (internal citation and footnote omitted)). Nonetheless, this Court bases its conclusion that denial of discharge is warranted under § 727(a)(4)(A) on debtors' material misrepresentations regarding the existence of three lawsuits and on the aggregate of debtors' misstatements and omissions in their bankruptcy filings—not on this individual listing on the Means Test.

---

[4] The Bankruptcy Court also found misrepresentations by debtors related to one of the deductions that debtors listed on their Means Test: a $175 expense for telecommunication services other than basic home telephone service. Specifically, debtors testified that the expense was comprised of $40 was for a cell phone bill and

there's no indication that that check came from Wendy's?

A: No, I can't.

Q: Okay. I want you to look at page 109 again and I want you to look at November 6, 2006; $1886.51, and that says "Wendy's International direct deposit," does it not?

A: Yes, it does.

Q: Okay. And then on October 23rd of 2006 for $2819.82, "Wendy's International direct deposit," do you see that?

A: Yes.

Q: Okay. Is it still your testimony that the $2448.57 was simply income?

A: Simply what?

Q: Income that was included already on the means test?

A: I don't recall.

Q: You don't recall?

A: No.

Q: Okay. All right. On page 107, there's a deposit for $723.21 that appears on January 3 of 2007, do you see that?

A: 1/3/07 you said?

Q: The date of January 3, 2007 for $723.21.

A: Yes.

Q: Do you have any idea what that was for?

A: No.

* * *

Q: So you really can't explain the $723.21 deposit, can you?

A: On what date?

Q: That date we just talked about. The one that appears on your bank statement on January 3 of 2007.

A: No, I can't. I don't recall it.

Q: So you're not really sure whether or not that deposit was ever accounted for on your means test?

A: I don't know.

(Tr. 104:19-105:17; 106:10-17.) Also, Mr. Moreo misrepresented whether the Bagel Store had an ATM card:

Q: And was your testimony truthful on that day?

A: I believe, yes, it was. I thought we didn't have an ATM card for the bagel store.

Q: Did you ever correct your testimony?

A: I'm telling you now.

Q: Prior to today, did you ever correct your testimony?

A: No.

Q: Were you supplied with a copy of your original transcript to read over?

A: Yes, I was.

(Tr. 140:13-25.) Mr. Moreo also acknowledged during his examination that he may not have included additional monies in his means test:

Q: So if, in fact, these are not pay that you received from Wendy's, what are they?

A: Probably borrowed money from my cousin, I know that.

Q: You borrowed money from your cousin?

A: Right.

Q: When did you do that?

A: I believe, if I'm not mistaken, I'm not a hundred percent sure of the 2380, because what happened was I had money taken out of my account. I had 1951 levied against me and it was – there was another one also that was levied against me and I wouldn't have been able to pay my mortgage and stuff so my cousin probably gave me money also.

Q: Okay. Did you ever disclose that before today?

A: I don't think so. I'm not sure. I think it's all here.

Q: And that money was never included, therefore in the means test?

\* \* \*

Q: Did you ever include the 2380 dollars in your means test?

A: I don't believe I did.

(Tr. 112:13-113:14; *see also* Tr 114:12-17 ("Q: And you further answered that the 3500 dollars was included on the means test? A: I believe so, yes. Q: Okay. But you omitted the loans from your cousin at the same time? A: I believe so.").) Further, Mrs. Moreo's testimony indicated that it was possible that debtors did not disclose all their bank accounts in their bankruptcy petition:

Q: It says "List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within one year immediately preceding the commencement of the case."

A: Okay.

Q: And then it goes on. You, in fact, list two different checking accounts.

A: Okay.

Q: You list the personal – what appears to be a personal account, because it's not differentiated and the second one is differentiated as a business checking account. You list a checking account number 314381441, which had $380.21 that you closed on February 15th, 2007. . . . The checking account that you say you closed and the one that your husband testified to that closed in February of '07, that's account number – it doesn't match up with the account number listed on this schedule at all in the February '07 one. . . . That account number doesn't

appear to be the account number on the statement of financial affairs in question 11 either, does it? That's the one ending in -1565239, and it doesn't appear to have a balance of $380.21. So I'm not so sure those are the same accounts. So is this a third account that you had, this one where you directed the 8,000 dollar deposit or the other deposit from the IRS?

A: Well, you must have the records then.

(Tr. 339:2-5, 339:20-340:24.)

Appellants attempt to rely on *In re Schultz*, 239 B.R. 664, 668 (E.D.N.Y. 1999) to support their assertion that Mrs. Moreo's conduct was not egregious and that discharge here is unwarranted. In *Schultz*, the court found that a debtor's failure to disclose an equitable interest in certain property did not bar a discharge under § 727(A)(4)(A) because the debtor in *Schultz* did not have an equitable interest in the property: "The uncontroverted facts indicate that Schultz did not pay the mortgage or any part of the down payment on the property at issue. While Schultz did make real estate tax payments, this alone, does not amount to an equitable interest. As Judge Conrad properly concluded, it appears that rather than making payments of rent, Schultz was paying his share in return for the opportunity to live in a home owned by his in-laws." The court upheld the Bankruptcy Court's determination that fraudulent intent did not exist with respect to two additional omissions from the debtor's bankruptcy schedule in that case. *See Schultz*, 239 B.R. at 668. However, the district court's affirmance of the bankruptcy court's conclusions in that case was based largely on the bankruptcy judge's findings of fact, which were "based on [the debtor's] credibility, his demeanor and a factual finding as to his state

of mind." *Id.* This Court similarly notes that, "[a]s the judge hearing the testimony and viewing the witness," Judge Eisenberg "was clearly in the best position to make this type of decision and this Court will not interfere with [her] factual conclusions," which are supported by the evidence presented at trial. *See id.*

Having carefully reviewed the entire record, this Court concludes that the Bankruptcy Court's denial of debtors' discharge under § 727(a)(4)(A) was warranted, and the Bankruptcy Court did not err in reaching that determination.

VI. Conclusion

For the foregoing reasons, the Court affirms the September 10 Memorandum and Order of the Bankruptcy Court.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 3, 2010
Central Islip, New York

* * *

The attorney for appellants is Richard F. Artura of Phillips, Weiner, Quinn & Artura, 165 S. Wellwood Avenue, P.O. Box 405, Lindenhurst, NY 11757. Appellee is proceeding *pro se*.